The opinion of the court was delivered by
Manning, C. J.
James A. Stone, as administrator of W. R. Stone’s succession, filed his account, and tableau of distribution of its assets, which is opposed by the assignees of the Bank of Louisiana and of Dudley & Nelson, on various grounds, some of which have been abandoned. Those now insisted on are the following ;
1. The administrator debited the succession with $174.22, the sum *312 in the hands oí R. T. Buckner & Bro. in March 1878, which was lost by their failure.
In July 1877 there was a balance in the hands of the Buckners, due the succession, of $382.17, which was transferred to the credit of J. A. Stone, administrator, who permitted it to remain there. Thereafter, it was at his risk. Persons holding money in a fiduciary capacity, are not permitted to leave it with commission merchants merely because it is convenient, or because as individuals they choose to deal with their own money in that way. The administrator must be charged with $174.22 the sum thus lost in March 1878.
2. A claim in favour of Joseph Noland for $2,400.00 was placed on the tableau as a debt, privileged upon certain notes amounting to $2,504.65.
Noland had leased to ~W. R. Stone the Omega landing and contiguous grounds for ten years, commencing January 1, 1875, at a rental of $300 per annum, there being a stipulation, withholding the authority to sublet save with the lessor’s consent. On February 3,1877, two days before his death, the lessee sold to John B. Stone his storehouse and fixtures on the Omega landing for $1,200.00 — his dwelling-house and outbuildings on same grounds for $1,500.00 — the Noland lease for its unexpired term, ending Dec. 31,1885, “ for the price and sum of $300 per annum, amounting to $2,500.00 ” — horses, mules, waggons, etc. for $1,210.00 — and his stock of goods, at inventory prices, for $1,839.00 — amounting in the aggregate, the bill of sale reads, to $8,149.'00. The correct aggregate is $8,249.00, which countenances the conjecture that the price of the lease should have been stated at $2,400.00, as it would be for eight years at the rental mentioned, and this being corrected in that way, the aggregate of the whole purchase is properly summed up. Notes were given for this sum total — nine notes for varying sums, the smallest of which is for $75.00, and the largest for $500.00, all aggregating $2,504.65 and payable January 1,1878, and three notes for $1881.45 each, payable on the first days of the years 1879,1880, and 1881.
The privilege of the lessor upon the nine notes is recognised as being movable effects of the lessee, found on the property leased) and the opponent contends that the concluding paragraph of art. 2675 of the Civil Code (new no. 2705) restrains the application of the privilege and right of pledge to the furniture or merchandize in the house or apartment, if it be a store or shop. The contrary was expressly held in Mathews v. Creditors, 10 Annual, 718, where it was said that the clause which confers the privilege is absolute and unambiguous, and the words 'movable effects’ were too comprehensive to admit of doubt or discussion with reference to their application, and that the concluding clause of the article appears rather illustrative than restrictive in its character. *313 It was also said, there was no good reason why the assets of a banker, so far as they are susceptible of .being pledged, should not be subjected to the same right of pledge as merchandize in a store, and Bazin v. Segura, 5 Annual, 718, is cited as a correct exposition of the article.
As a matter of fact, it must appear by proof that these notes were found on the leased property, and opportunity will be given to supply that proof.
There is some discussion in the briefs upon the questions, whether the succession is not entirely relieved of the debt for the future rent, and whether Noland, in assenting to the lease, did not accept the new lessee, or the purchaser of the unexpired term, as his debtor in the place and stead of the original lessee. We do not think either position is tenable. The succession of the deceased is bound to fulfill the contract for the payment of the rent, and it is doubly bound so to do in the present case, since the price of the unexpired term of the lease has gone into its assets. Noland’s assent to any subletting was merely a stipulation to prevent a sub-lessee, whom he was unwilling to occupy the premises, from acquiring the contract. It is also contended that the price of the lease, recited in the act of sale, was a premium on the lease, upon the authority of Daquin v. Amant, 14 Annual, 217. The ruling in that case was confined to a judicial sale of the lease, and it may also be said, that the price mentioned in the sale is the same sum the original lessee was bound for.
But what is the present amount of the debt which the succession owes for the lease ? The annual rental is $300.00, payable each year to 1885. It is very clear that the succession does not owe now the whole rent. The death of the lessee does not alter the maturity of his stipulated annual payments, and cause the whole rent for eight future years from his death to be at once exigible. Nor can his succession be kept open during all those years, waiting for the annual payments to mature. In the absence of positive law upon this matter, we must be guided by equitable considerations, and we can revert to the rules established for other matters somewhat analogous to it.
The Code provides that where property of a succession is sold partly for cash, and partly on a credit, on a partition of the proceeds of the sale, the whole amount shall be reduced to its cash value, by deducting from the whole sum to be paid eight per centum per annum, and those heirs who require their portion to be paid in cash shall receive it ón the whole amount thus reduced, art. 1264 new no. 1342. The creditor of this succession, who is only entitled to the annual payment of $300.00 for several years to come, must have his claim reduced to its present cash value, by deducting therefrom the same per centum per annum, calculated as is provided in the case of heirs.
*314 3. Mrs. Harvey is recognised as a creditor for $1,025.20. Her counsel admits it should be reduced by $32.25. The deceased Stone acted as her agent, and received this sum of money for her — collected her rents and accounts. The administrator admitted it as a privilege. Upon what? It appears the privilege is supposed to rest upon any money in Stone’s possession. There was none found there so far as this record informs us. It is not alleged that he kept her .money separate and apart, labelled and capable of identification. It is clear that his succession is liable for the sum he collected for her, and it is equally clear that she has not a privilege upon any special funds for its payment. There is no evidence of the existence of any special fund. The debt is an ordinary one. Longbottom v. Babcock, 9 La. 44. Whatley v. Austin, 1 Rob. 21.
The opponents and appellants have filed an assignment of errors on two points of law, apparent on the face of the record, as they allege.
1. That the succession was insolvent, and the administrator was bound to apply for an order convening the creditors to deliberate on the most advantageous mode of selling the effects. The inventory of property and assets amounted to $26,450.70 and the debts were $26,-716.61. The language of the Code of Practice is permissive and not mandatory, art. 1038.
2. The judgment of homologation directs the cancellation of the administrator’s bond to the amount of $13,316.84, that being the portion of his account which was homologated.
This is error. The bond is a whole, an entirety, and is not to be cancelled in part until the whole gestión is completed.
3. A claim of R. T. Buckner & Bro. for $6,552.03 is said to have been secured by ‘ mortgage’ of a life policy of $10,000.00. Probably a pledge is meant. In either case proof should bo supplied of that fact, and if any portion of the policy belongs or belonged to the succession, such portion must be accounted for.
Another claim for $635.75 is said to be placed on the account as a privileged debt. There must be supplied proof, both of the existence and validity of the claim, as well as of the privilege.
The sale of the three notes of $1881.45 each, for the meagre sum of $350.00, and the purchase of them by the maker, needs explanation and justification. Unless explained and justified, the administrator may be responsible for their actual value. It does not escape observation, that while the nine matured notes are recognised as subject to a privilege for the payment of nearly as many unmatured instruments of rent, the non-maturod notes are sold for a paltry sum. In the next trial, the administrator and the opponent will have an opportunity to subject this *315 part of the gestión to a more satisfactory examination than has yet been done.
It is ordered and decreed that the judgment of the lower court is avoided and reversed as to the several matters or items set forth and adjudged in this opinion, and the cause is remanded to the lower court for the amendment of the Tableau of Distribution and the Account, so far as definitively passed on herein, and for a new trial of the same as. to those left open for further examination and proof. It is further ordered that the succession pay the costs of appeal.